O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEVIN ANTHONY LATHAM,<br><br>Petitioner,<br><br>v.<br><br>J. GASTELO, Warden,<br><br>Respondent. | Case No. 2:16-cv-05787-KES<br><br>MEMORANDUM OPINION AND ORDER |

## I.
## INTRODUCTION

In 2014, a Los Angeles County jury convicted Kevin Anthony Latham ("Petitioner") of burglary. (Dkt. 16, Lodged Document ["LD"] 1, Clerk's Transcript ["CT"] 112.) On August 3, 2016, Petitioner filed a Petition for Writ of Habeas Corpus by a Person in State Custody pursuant to 28 U.S.C. § 2254. (Dkt. 1.) As of October 31, 2016, both Petitioner and Respondent consented to proceed before the Magistrate Judge. (Dkt. 7, 17.) On April 4, 2017, Petitioner filed his operative Second Amended Petition ("SAP") raising one claim for relief: insufficiency of the evidence to support his burglary conviction. (Dkt. 23 at 5.) For the reasons discussed below, the Court finds that there was sufficient evidence to support this

conviction and therefore denies his habeas petition.

## II.

## SUMMARY OF THE EVIDENCE

**A.     The Prosecution's Evidence.**

    **1.     Testimony from the Victim and Her Son.**

Bernadette Scarfo-Airuyuwa lived in Palmdale, California in 2013. In January and early February of that year, she was visiting Africa, and she asked her son, James Lenaris, to check on her home every few days. Scarfo-Airuyuwa locked all her windows and doors before she left. (Dkt. 29, LD 12, Reporter's Transcript ["RT"] vol. 2 at 328-31, 352, 373.)

Her son checked on the house around February 1 or 2, 2013, and he did not see anything amiss. (2RT 373-75, 460.) When Scarfo-Airuyuwa returned home on February 5, 2013, she noticed that many items were missing throughout the house. (2RT 331-32, 350-52.) After she called the sheriff's department, a deputy arrived and went through the house with Scarfo-Airuyuwa and Lenaris. (2RT 496-99.) The dining room window was broken so that a person could put a hand through and open the window. (2RT 350-51.)

While Scarfo-Airuyuwa was waiting for the deputies outside her home, she noticed a dark green Cadillac driving slowly eastbound past her home. When Scarfo-Airuyuwa and her family looked at the driver, he accelerated. Scarfo-Airuyuwa saw the driver's face and identified Petitioner as the driver at trial. (2RT 347-48, 366, 381.) Lenaris got in his car and chased the green Cadillac. (2RT 379, 366.) He saw it driving "really fast." (2 RT 380.) Lenaris also identified Petitioner as the driver at trial. (2RT 384.)

Lenaris testified that he paid attention to the green Cadillac driving by because he noticed two of the letters in its license plate. These matched a license plate number he had been handed on a piece of paper by an unknown woman. Also, it seemed to Lenaris that the driver was looking for something as he drove by. For

these reasons, Lenaris jumped in his car and followed him. (2RT 379-80.)

Lenaris followed the speeding Cadillac into a cul-de-sac where the Cadillac stopped in front of a house with a red door. Lenaris saw the driver, whom he later identified as Petitioner, get out and run toward the side of the house. Lenaris turned his car around and pointed at the man, saying "I got you" before driving off. (2RT 380-83, 456.) Lenaris later gave the piece of paper bearing the license plate number to the sheriff's deputy and told him what he had seen. (2RT 385.)

Later that same evening, the deputies took Scarfo-Airuyuwa and Lenaris to a house for possible identification of property. It was the same house where Lenaris had seen the Cadillac stop: 2803 Dolomite. Petitioner was not present. At trial, the prosecutor showed Scarfo-Airuyuwa photographs of numerous items of property, which she identified as items that were taken from her home. She recovered the items she identified at trial from 2803 Dolomite, but other items were never returned. (2RT 334-46.)

### 2. Testimony from the Victim's Neighbor.

Juan Hernandez lived across the street from Scarfo-Airuyuwa. Sometime between February 2 and February 5, 2013, while Scarfo-Airuyuwa was in Africa, he saw someone resembling Petitioner outside Scarfo-Airuyuwa's home.[1] (2RT 471-73.) Hernandez also noticed a green Lincoln or Cadillac parked in Scarfo-Airuyuwa's driveway. The photograph of the Cadillac in People's exhibit 4A was like the vehicle he saw. (2RT 474-75.) He saw Scarfo-Airuyuwa's front door was open and the lights in the house were on. (2RT 482.) Hernandez went over and asked Petitioner what he was doing there. (2RT 483.) Petitioner told Hernandez that he knew the residents and was helping the neighbor move certain things.

---

[1] At trial, Hernandez first testified that Petitioner "looks like" the man he saw at Scarfo-Airuyuwa's house on February 2 or 3, 2013. (2RT 472.) When asked to point out the man, he pointed to Petitioner and described his shirt color. (2RT 473.)

3

Hernandez did not see any furniture or other objects outside, but he did not look inside the car. He did not see Petitioner carrying anything or exiting the house. Hernandez returned home. Hernandez said he had seen Petitioner in the neighborhood before. He had never seen Petitioner at Scarfo-Airuyuwa's house before. (2RT 483-85.)

Hernandez believed Scarfo-Airuyuwa's daughter, Shadell Liner, broke the dining room window before the burglary when her mother would not let her in, although he did not hear the glass breaking while he listened to their argument. (2RT 486, 491.) He acknowledged that he had not looked at the window and was not aware there was a fist-sized hole in it. (2RT 495.) He knew it was broken because he could see the plywood from his house before the burglary. (2RT 491.)

### 3. Investigation by Deputies Nisenoff and Porter.

Los Angeles County Sheriff's Deputy David Nisenoff responded to the burglary call. He saw that the living room was almost vacant, and indentations in the carpet showed where heavy items had been. A window was broken. (2RT 496-99.) He was not sure, but he did not believe the window was boarded up. (2RT 499-500.)

Deputy Nisenoff was given the paper with the license plate number, and he linked the number to its registered owner using his department's resources. (2RT 500-01.) The owner was Christabel Pierce whose address was 2803 Dolomite. (2RT 501.) He went to the address, and Pierce consented to a search of the house. (2RT 503-04.) Upon entering, Deputy Nisenoff immediately saw several items that Scarfo-Airuyuwa had described as having been taken. (2RT 504-06.) He confirmed that the vehicle in the garage, a 1994 green Cadillac sedan, bore the license plate number Lenaris had given him. It was the same vehicle depicted in People's exhibit 4A. (2RT 506.) Scarfo-Airuyuwa and Lenaris came over and identified their property. (2RT 508-09.) Pierce was arrested that night for receiving stolen property. (2RT 511.)

Deputy Terra Porter later arrested Petitioner at Pierce's house, 2803 Dolomite. (3RT 602.) Deputy Porter identified the booking and property record in People's exhibit 9 as the form she prepared for Petitioner. (3RT 603.) The information on the form was obtained from Petitioner's California driver's license or identification card and by asking Petitioner. (3RT 604-05.) Petitioner confirmed to Deputy Porter that he lived at 2803 Dolomite. (3RT 606.)

### 4. Forensic Evidence.

Karen France, a fingerprint technician, lifted fingerprints from Scarfo-Airuyuwa's residence. (3RT 615.) The screen of the dining room window had been removed, and there was a fist-sized hole in the stationary pane. (3RT 615.) The window was not boarded up. (3RT 616.) France used a fine carbon-based powder to lift latent prints from the window. (3RT 614-16.) One print was lifted from the outside of the window just below the broken hole. A second print was lifted from the window frame adjacent to the hole and was also on the outside. (3RT 618.) A third print was lifted from the inside opening edge of the sliding glass window adjacent to the broken window. A fourth print was found on the inside of the right edge of the sliding glass window. (3RT 619.)

Deputy Sheriff Jeffrey Collins, a fingerprint identification expert, compared Petitioner's fingerprints to the prints that France had obtained. Deputy Collins determined that there was a match between Petitioner's right index finger and the third set of prints that France obtained from the inside edge of the east dining room window. (3RT 633-43, 653-54.)

### B. The Defense's Evidence.

Petitioner testified on his own behalf. Petitioner lived in Los Angeles, although he visited Antelope Valley regularly to see his children and his children's mother, Pierce. (3RT 671-72.) Petitioner has a prior felony conviction for a 2004 attempted robbery. (3RT 673.) Pierce owned a green Cadillac, but Petitioner did not drive that car. (3RT 679.)

5

Petitioner did not know Scarfo-Airuyuwa. (3RT 675.) However, Petitioner had been in Scarfo-Airuyuwa's home visiting her daughter, Shadell Liner, "talking and dating" once or twice a week over a period of two or three months. Petitioner referred to Scarfo-Airuyuwa's daughter as "Chardell." (3RT 681, 701.) While he was in the house, he opened the dining room window to let the marijuana smoke out. (3RT 681-82.)

Petitioner knew Hernandez and saw him about three or four times a week. (3RT 684.) They would often smoke marijuana and drink beer together. Petitioner denied ever telling Hernandez that he was taking things out of Scarfo-Airuyuwa's house. (3RT 684-85.)

On February 5, 2013—when Scarfo-Airuyuwa and her son testified that they saw Petitioner driving past her house—Petitioner was at his mother's house in Los Angeles doing mechanic work. (3RT 683, 703.) Petitioner never claimed Pierce's Palmdale address was his address, and he gave the deputy his Los Angeles address when booked. (3RT 688-89.)

## C. The Prosecution's Rebuttal Evidence.

Shadell Liner, Scarfo-Airuyuwa's twenty-year-old adopted daughter, testified that she did not have access to her mother's house while her mother was in Africa. (3RT 904-05.) Liner did not know Petitioner, but she had attended school with Crystal Thomas, whose mother was also the mother of Petitioner's children.[2] Petitioner was not Liner's friend and she never let him into her mother's home. (3RT 906-07.) Liner never associated with or even conversed with Petitioner. (3RT 907-08.) Liner never broke any windows in her mother's home. (3RT 910.) There were no windows in the house broken or cracked before her mother went to Africa. (3RT 911-13.)

---

[2] It is unclear whether Liner was referring to Pierce or to another woman; she did not know the name of Crystal Thomas's mother. (3RT 907.)

6

Petitioner's California Department of Motor Vehicle records listed his mailing address as Pierce's home in Palmdale, 2803 Dolomite. (3RT 933.)

At about 6 p.m. on February 14, 2013, Deputy Nisenoff engaged in a traffic stop of a Cadillac Deville, license plate 6UTY192. Petitioner was the driver and the only person in the Cadillac at the time of the stop, which was in the Palmdale area. (3RT 939-40, 946.) On the booking sheet, Petitioner listed Pierce as his wife and her home as his address. (3RT 946.)

## III.

## STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996, as amended ("AEDPA"), a petitioner is entitled to habeas relief only if the state court's decision on the merits "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court" or "(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Cullen v. Pinholster, 563 U.S. 170, 181 (2011).

The relevant "clearly established Federal law" that controls federal habeas review consists of holdings (as opposed to dicta) of Supreme Court decisions "as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. 362, 412 (2000). A state court acts "contrary to" clearly established Federal law if it applies a rule contradicting the relevant holdings or reaches a different conclusion on materially indistinguishable facts. Price v. Vincent, 538 U.S. 634, 640 (2003). A state court "unreasonably appli[es]" clearly established Federal law if it engages in an "objectively unreasonable" application of the correct governing legal rule to the facts at hand. White v. Woodall, __ U.S. __, 134 S. Ct. 1697, 1705-07 (2014). "And an 'unreasonable application of' [the Supreme Court's] holdings must be objectively unreasonable, not merely wrong; even clear error will not suffice." Woods v. Donald, __ U.S. __, 135 S. Ct. 1372, 1376 (2015) (per curiam) (citation omitted).

Habeas relief may not issue unless "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." Harrington v. Richter, 562 U.S. 86, 103 (2011); see also id. at 103 (as "a condition for obtaining habeas relief," a petitioner "must show that" the state decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement"). "[T]his standard is 'difficult to meet,'" Metrish v. Lancaster, 569 U.S. 351, 358 (2013), as even a "strong case for relief does not mean the state court's contrary conclusion was unreasonable." Richter, 562 U.S. at 102. "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' … and 'demands that state-court decisions be given the benefit of the doubt.'" Renico v. Lett, 559 U.S. 766, 773 (2010) (citations omitted).

Here, Petitioner claimed insufficiency of the evidence on direct appeal. (LD 2.) Accordingly, the California Court of Appeal's decision is the relevant state court adjudication on the merits for purposes of applying AEDPA's deferential standard of review. (LD 6); Berghuis v. Thompkins, 560 U.S. 370, 380 (2010) (holding where state supreme court denied discretionary review of Court of Appeal's decision on direct appeal, the appellate decision on direct appeal is the relevant state court decision for purposes of the AEDPA standard of review).

## IV.

## DISCUSSION

Petitioner argues that the "evidence presented by the prosecution was insufficient to prove that [he] had committed burglary." (SAP at 5.) On direct appeal, Plaintiff argued that no one saw him in Scarfo-Airuyuwa's home, no one saw him carrying items out of the home, and there was no evidence that he knew the items recovered at Pierce's house were stolen. (LD 2.)

**A.** **Relevant State Court Proceedings.**

The California Court of Appeal rejected Plaintiff's insufficiency of the

evidence claim, reasoning as follows:

> There was ample evidence in support of defendant's burglary conviction. The jury was instructed on the difference between direct and circumstantial evidence and told that both types of evidence were acceptable to prove or disprove the elements of a charge, including intent, and that neither was entitled to any greater weight than the other. (CALCRIM Nos. 223, 225.) The jury was instructed that, when considering circumstantial evidence, it had to accept only reasonable conclusions. (CALCRIM No. 225.) We believe the jury reached a reasonable conclusion based on the facts given in evidence.
>
> Bernadette testified that no one except her son had the keys to her home, and no one but he had permission to be in her home while she was in Africa. She arrived home to find many of her possessions missing. Bernadette's neighbor, Hernandez, saw defendant and the green Cadillac across the street at Bernadette's home between February 2 and 5, 2013. He had never seen him at that house before. The door of Bernadette's home was open and the lights were on while defendant was there. While Bernadette waited for sheriff's deputies to arrive, she saw the green Cadillac pass by her house slowly and then accelerate. Lenaris noticed that the license number of the green car contained letters in a license plate number given him by a woman who had approached the family outside Bernadette's house. He followed the green Cadillac to a house on Dolomite Avenue and saw defendant walk or run to the side of the house. That same evening, deputies called at the house and saw several items belonging to Bernadette. The woman who lived in the house was defendant's girlfriend and the mother of his children. A fingerprint found on the inside of a broken window at Bernadette's house, which was the apparent point of entry, was identified as belonging to defendant. Fingerprint evidence is very strong evidence of identity and is generally sufficient on its own to identify a perpetrator. (People v. Gardner (1969) 71 Cal.2d 843, 849.)
>
> Defendant's explanation for the damaging evidence against him in the

*prosecution's case-in-chief did little but bring his credibility into question. He said he visited Pierce nearly every weekend and sometimes during the week but then said he had no idea when she moved to the house on Dolomite Avenue. He said he had never driven the green Cadillac, but it was revealed he was arrested during a traffic stop while he was driving that car, and Hernandez saw defendant with the car at Bernadette's home. Defendant claimed his fingerprint was found on the interior of the window because he opened it when he was smoking marijuana in Bernadette's house at the invitation of her daughter. The jury, however, was entitled to draw its own conclusions as to defendant's credibility versus that of Shadell, and as to his version of how his fingerprint came to be on the window. (People v. Gardner, supra, 71 Cal.2d at p. 849.) Defendant acknowledged he had previously been convicted of attempted robbery.*

*Although one of defendant's principal arguments is that no one saw him moving things from the house, Hernandez, who had no apparent motive to lie, testified that when he confronted defendant about what he was doing at the house, defendant said he was helping the owner by moving some things. The jury was entitled to lend credibility to Hernandez's testimony and draw the inference that defendant was moving items, or planned to move items, out of the house. As for Hernandez's testimony that the window was broken long before Bernadette's trip, it was up to the jury to decide whether his recollection was accurate. The fingerprint technician testified that the window was not boarded up. Finally, all of the stolen items recovered were found at the nearby home of Pierce, the mother of defendant's children.*

*Clearly, a jury could draw the reasonable inference from the totality of the circumstantial evidence that defendant burglarized Bernadette's home. Defendant's argument is without merit.* (LD 6 at 7-9.)

**B.    Applicable Federal Law.**

The clearly established federal law governing review of a due process claim

for insufficient evidence is the standard set forth in Jackson v. Virginia, 443 U.S. 307 (1979). The Jackson standard provides that a habeas petitioner is entitled to relief if it is found that "'upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt.'" McDaniel v. Brown, 558 U.S. 120, 121 (2010) (per curiam) (quoting Jackson, 443 U.S. at 324); see also In re Winship, 397 U.S. 358, 364 (1970) ("[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.").

Under this standard, the test for sufficiency is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime," as defined by state law, "beyond a reasonable doubt." Jackson, 443 U.S. at 319, 324 n.16 (emphasis in original). If the record supports conflicting inferences, the reviewing court "'must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" McDaniel, 558 U.S. at 133 (2010) (quoting Jackson, 443 U.S. at 326); see also Cavazos v. Smith, 565 U.S. 1, 2 (2011) (per curiam) ("[I]t is the responsibility of the jury – not the court – to decide what conclusions should be drawn from the evidence admitted at trial."); Juan H. v. Allen, 408 F.3d 1262, 1275 (9th Cir. 2005) ("In conducting our inquiry, we are mindful of 'the deference owed to the trier of fact and, correspondingly, the sharply limited nature of constitutional sufficiency review.'" (quoting Wright v. West, 505 U.S. 277, 296-97 (1992) (additional citations omitted)).

Moreover, federal courts reviewing a state court's adjudication of a sufficiency of the evidence claim must, under the AEDPA, "apply the standards of Jackson with an additional layer of deference." Juan H. 408 F.3d at 1274 (citing 28 U.S.C. § 2254(d)); see also Coleman v. Johnson, 566 U.S. 650, 651 (2012) ("We have made clear that Jackson claims face a high bar in federal habeas proceedings

because they are subject to two layers of judicial deference."). Thus, "a state-court decision rejecting a sufficiency challenge may not be overturned on federal habeas review unless the decision was objectively unreasonable." Parker v. Matthews, 567 U.S. 37, 43 (2012) (per curiam) (internal quotation marks and citation omitted); see also Long v. Johnson, 736 F.3d 891, 897 (9th Cir. 2013) ("[U]nder AEDPA … we are limited to deciding whether the California courts unreasonably applied Jackson" in concluding that the evidence was sufficient).

Insufficient evidence claims are reviewed by looking at the elements of the crime under state law. Jackson, 443 U.S. at 324 n. 16. Under California law, "[e]very person who enters any house … with intent to commit … grand or petit larceny or any felony is guilty of burglary." Cal. Penal Code § 459.

**C.** **The California Court of Appeal Reasonably Rejected Petitioner's Claim.**

The prosecution presented more than sufficient circumstantial evidence that Petitioner broke into Scarfo-Airuyuwa's house with the intent to steal her belongings. There was substantial evidence placing Petitioner at the scene of the crime during the time frame when it occurred. The robbery happened after Lenaris last checked the house (i.e., February 1 or 2 [2RT 273-75, 460]) but before Scarfo-Airuyuwa returned home from Africa (i.e., February 5 [2RT 331]). Neighbor Hernandez saw Petitioner at Scarfo-Airuyuwa's house on February 2 or 3 (i.e., Saturday or Sunday). (2RT 480.) He testified that he saw Petitioner there over a period of at least twenty minutes. (2RT 483.) He recognized Petitioner as someone he had seen around the neighborhood, and he walked up and spoke to him. (2RT 484.) Hernandez also saw the green Cadillac parked at Scarfo-Airuyuwa's house while Petitioner was there, and he did not see anyone else with Petitioner. (2RT 473-76.) At trial, Hernandez identified Petitioner as the person he saw at Scarfo-Airuyuwa's house in early February. (2RT 473-73.)

Not only was Petitioner present at the house in early February, but also there was strong evidence that he went inside. Hernandez saw that the front door of the

house was open and lights in the house were on. (2RT 482.) When Hernandez asked Petitioner what he was doing there, Petitioner admitted that he had gone into the house; he told Hernandez that he was helping his neighbor move some things. (2RT 483-85.) The fingerprint expert testified that a print lifted from an inside edge of the broken window matched Petitioner's right index finger. (3RT 619, 643.) While Petitioner testified that he left those prints when he was in the house smoking marijuana with Liner, Liner testified that she had never even spoken to Petitioner, let alone invited him into her mother's house to smoke marijuana. (3RT 907-08.) The jury was entitled to believe Liner rather than Petitioner.

Next, Scarfo-Airuyuwa identified items found at 2803 Dolomite as items taken from her house (e.g., a drum set, television, mirror, picture frames, elephant statues, clothing, and shoes). (2RT 336-43.) There was no evidence presented at trial that anyone other than Pierce, Petitioner, and their children had access to the house at 2803 Dolomite. (3RT 671-72.) Pierce did not testify. Deputy Nisenoff testified that when he knocked on the door in uniform the night of February 5, Pierce opened the door and consented to him searching the house. (2RT 504.) Deputy Nisenoff saw large items taken from the Scarfo-Airuyuwa's house in plain view, such as a leaning ladder bookshelf and drum set. (2RT 504-06.) From these facts, the jury could have drawn an inference that Pierce did not realize the items were stolen.

While Petitioner denied ever living at the 2803 Dolomite address, much evidence linked him to that address. Lenaris saw him drive the green Cadillac to that address. (2 RT 379-83.) He was arrested at that address. (3RT 605.) Petitioner's DMV records and driver's license listed an address on Dolomite as his home address. (3RT 604-05, 933-36.) Furthermore, Petitioner had been stopped driving the green Cadillac. (3RT 939-40.) Deputy Nisenoff saw the green Cadillac parked in the garage at 2803 Dolomite the night of February 5, 2013. (2RT 506.) Pierce, the mother of Petitioner's children, lived at that address. (3RT 671-72.)

Finally, the jury had good reasons to disbelieve Petitioner's testimony. He was a convicted felon. (3RT 673.) Petitioner's testimony was contrary to that of five other witnesses: Lenaris, Liner, Hernandez, Deputy Nisenoff, and Deputy Porter. He disputed Lenaris's testimony that Lenaris had seen him in Palmdale driving the green Cadillac on February 5, claiming that he never drove that car and that he was in Los Angeles at his mother's house "doing mechanic work" that day. (Compare 2RT 379-83, 3RT 683, 691, 701.) Petitioner's mother did not testify. Petitioner disputed Liner's testimony that they were unacquainted, claiming instead that they dated and smoked pot together. (Compare 3RT 681, 700-01 and 3RT 906-08.) He disputed Hernandez's testimony that they had never spoken before February 5, and disputed that Hernandez had spoken to him on that day, asking him what he was doing. (Compare 2RT 471, 483 and 3RT 684-85.) Deputy Nisenoff testified that he had pulled Petitioner over driving the green Cadillac, but Petitioner repeatedly denied ever driving that car even once. (Compare 3RT 691 and 3RT 939-40.) Deputy Porter testified that she corrected Petitioner's address on his booking form after speaking with him to confirm it, but Petitioner testified that she never asked him to confirm his address. (Compare 3RT 688 and 3RT 934.)

In addition to dishonesty, Petitioner displayed other behavior that the jury could have interpreted as consciousness of guilt. Both Lenaris and Scarfo-Airuyuwa described Petitioner driving by and looking at the crowd of family members standing outside waiting for the police to arrive on the evening of February 5. (2RT 347-48, 365, 369-70, 379.) Instead of stopping to ask what had happened or offer assistance, Petitioner sped away when he saw them looking at him. (2RT 380-83.) He kept speeding away when Lenaris chased him and ultimately fled from Lenaris on foot. (2RT 347-48, 379-83.)

Taken together, the circumstantial evidence in this case was more than sufficient for the jury to conclude that Petitioner burglarized Scarfo-Airuyuwa's house while she was on vacation. Petitioner has not overcome the "two layers of

judicial deference" that must be afforded to the California Court of Appeal's rejection of his claim. 28 U.S.C. § 2254(d); Coleman, 566 U.S. at 651.

## VI.
## CONCLUSION

For these reasons, Judgment shall be entered denying the Petition and dismissing this action with prejudice.

DATED: October 31, 2017



_____
KAREN E. SCOTT
UNITED STATES MAGISTRATE JUDGE